# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**SONIA GHAWANMEH,**

    **Plaintiff,**

    **v.**                             **Civil Action No. 09-631 (JMF)**

**ISLAMIC SAUDI ACADEMY,**

    **Defendant.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I conclude that plaintiff has failed to prevail on any of her claims and that judgment must be entered in favor of the defendant. Below are my findings of fact and conclusions of law.

## FINDINGS OF FACT

### Background

1.    Plaintiff, Sonia Ghawanmeh,[1] is a naturalized American citizen originally from Jordan. Second Amended Complaint [#20-2] ¶ 16. She has a degree in Islamic studies from the Institute of Islamic and Arabic Sciences in America. PEX 1; 5/23/11 Tr. at 12-13.

2.    The defendant is the Islamic Saudi Academy ("ISA").[2] [#20-2] ¶¶ 10, 11.

3.    The Chairman of the Board of the ISA is always the Ambassador of the Royal Embassy of Saudi Arabia. 5/25/11 Tr. at 89.

---

[1] Plaintiff is also referred to in the record as Sonia Ahmed. PEX 11 at 1.

[2] Although plaintiff also named the Kingdom of Saudi Arabia as a defendant in her Second Amended Complaint, she never served it with a summons or complaint and it did not appear before this Court at any time. See Islamic Saudi Academy's Proposed Findings of Fact and Conclusions of Law in Support of Motion for Judgment Pursuant to FRCP 52(C) [#63] at 3.

4.      The ISA may not reject a Saudi student but it may reject a non-Saudi student. 5/25/11 Tr.

        at 90.

5.      The ISA is divided into four schools: 1) the Boys' Elementary School, 2) the Girls'

        Elementary School, 3) the Boys' High School and 4) the Girls' High School. 5/27/11 Tr.

        at 38.  It also has two locations, one in Fairfax and one in Alexandria. 5/23/11 Tr. at 273.

6.      The ISA provides instruction in English and in Arabic. 5/23/11 Tr. at 13.  Every student

        at the ISA has to take Arabic. Id. at 261.  Arabic and Islamic are taught in Arabic. Id.

        Everything else is taught in English. Id.  In the Islamic class, students are taught the

        principles of the Koran. Id.

7.      If the ISA wishes to employ a teacher, it first gives the teacher a letter of intent in May of

        the year prior to the academic year in question. 5/23/11 Tr. at 262.  The prospective

        employee then returns the letter to the ISA. Id.  If the teacher indicates a desire to teach

        the following year, a contract is issued. Id.  The ISA requires that their teachers sign a

        yearly contract. Id. at 18.  Teachers work from September through August. Id. at 145.

8.      Certain employees who work at the ISA are actually employed by the Ministry of

        Education of Saudi Arabia. 5/24/11 Tr. at 56.  Although their compensation may be

        different, they are still bound by the ISA's rules and regulations. Id. at 58-59.

9.      Teacher schedules are usually prepared in August. 5/27/11 Tr. at 60.  Generally,

        principals tell the school coordinators which teachers have been assigned to them and

        then class schedules are drawn up. Id.

10.     "Crossover teachers" are those that teach in multiple schools. 5/27/11 Tr. at 38.

        Crossover teachers report to the Principals of the respective schools as well as to

        Department heads. Id. at 40-41.

2

11.     Director Generals have the authority to hire and fire employees. 5/23/11 Tr. at 258.

12.     ISA employees are usually paid on the last day of the month, except if there is a holiday, in which case paychecks are distributed before the holiday. 5/23/11 Tr. at 220.

13.     Attendance records are maintained by Sayed Ahmed. 5/25/11 Tr. at 92.

14.     Teachers may take up to two days of medical leave without a letter from a doctor. 5/23/11 Tr. at 268; 5/25/11 Tr. at 92.  A request for three or more days must be accompanied by a doctor's note. Id.

15.     All ISA employees are given 7 sick days (56 hours) and 3 personal days (24 hours). 5/25/11 Tr. at 91.

16.     ISA employees may not take sick or personal leave immediately before or after a scheduled holiday or annual leave in order to extend that leave. 5/24/11 Tr. at 70-72; 5/27/11 Tr. at 127; JEX 48.

17.     If an employee takes sick leave immediately before or after a scheduled holiday or annual leave, that employee must submit a doctor's report. 5/27/11 Tr. at 126; JEX 48.

18.     Every employee qualifies for family medical leave. 5/23/11 Tr. at 270.  Teachers must apply for family medical leave and it is leave without pay. Id. at 268.  Employees may be granted leave to, *inter alia*, "care for a sick member of the family unit." JEX 40 at 1. "[U]p to eighty-four (84) calendar days of unpaid leave may be granted during the period of the contract/agreement of employment." JEX 41 at 1.

19.     Teachers may not take certain vacation days during the year whereas administrators may take their vacation days during the year because they work through the summer. 5/23/11 Tr. at 270; 5/24/11 Tr. at 72; 5/26/11 Tr. at 48.  Employees may take leave without pay "to extend annual leave" as long as it doesn't exceed ten days. JEX 41 at 1.

20.    Dr. Samy Abdulwahab Moussa, an Egyptian, began working for the ISA in December 1984. 5/25/11 Tr. at 85-86.  He has a bachelor's degree in management, a masters degree in development, and a Ph.D in communication arts. <u>Id.</u> at 85.  Since 2002, Dr. Moussa has been the ISA's Finance Manager. <u>Id.</u> at 87.

21.    If ISA employees exceed their allotted leave, Dr. Moussa deducts that from their salaries. 5/25/11 Tr. at 94.  In order to deduct the appropriate amount, Dr. Moussa divides the employee's salary by 194, the number of hours worked in a year, and then by 8, the number of hours worked in a day, to determine that employee's hourly rate. <u>Id.</u> at 95.

<u>1997</u>

22.    Plaintiff began working for the ISA during the 1997-1998 academic year as a full time substitute teacher. 5/23/11 Tr. at 14.  At that time, she taught Islamic studies in Arabic at the 7th grade level. <u>Id.</u>  Plaintiff then left the ISA for two years. <u>Id.</u>

<u>2000</u>

23.    Plaintiff returned to the ISA as a full time elementary school teacher in the Girls' School in September of 2000. [#20-2] ¶ 17; 5/23/11 Tr. at 14.  She again taught Islamic studies, but this time at the 3rd through 6th grade levels. 5/23/11 Tr. at 14-15.

24.    In the 2000-2001 academic year, plaintiff taught Islamic studies in the 2nd through 3rd and 5th through 6th grade levels in the Girls' School. 5/23/11 Tr. at 15.  This same schedule continued until 2007, when she was given one class in the Boys' School. <u>Id.</u> at 16.

<u>2001</u>

25.     On April 27, 2001, Mr. Sulaiman Al-Fraih, the ISA's Director General, sent plaintiff a
        contract offer for the 2001-2002 academic year at a salary of $37,738.00 for 195-199
        working days. PEX 2 at 8.

2002

26.     On April 12, 2002, Mr. Ibrahim Al-Gosair, the ISA's Director General, sent plaintiff a
        contract offer for the 2002-2003 academic year at a salary of $39,127.00 for 194-200
        working days. PEX 2 at 9.

27.     On September 1, 2002, plaintiff signed an "Annual Form Contract With ISA Personnel"
        for the 2002-2003 academic year at a salary of $39,127.00 for 194-200 working days.
        PEX 2 at 1.

2003

28.     On April 14, 2003, Nawal Saleh al-Muhaymed[3] wrote a letter to plaintiff noting her "lack
        of cooperation with the Administration [and] with the Department's head" and noting
        further that her contract "stipulates that [she] carry our any activity that is assigned to
        [her] by the Administration of the Department's head." JEX 50 at 1; 5/23/11 Tr. at 153-
        54.

29.     On May 1, 2003, Mr. Al-Gosair sent plaintiff a contract offer for the 2002-2003
        academic year at a salary of $40,516.00 for 194-200 working days. PEX 2 at 10.

30.     On June 20, 2003, plaintiff signed an "Annual Form Contract With ISA Personnel" for
        the 2003-2004 academic year at a salary of $40,516.00 for 194-200 working days. PEX 2
        at 2-3.

---

[3] The Court is unsure whether this individual is male or female.

5

<u>2004</u>

31.     On June 21, 2004, plaintiff signed an "Annual Form Contract With ISA Personnel" for

        the 2004-2005 academic year at a salary of $41,905.00 for 200 working days. PEX 2 at 4.

<u>2005</u>

32.     On May 6, 2005, Mr. Abdalla Al-Shabnan,[4] the ISA's Director General, sent plaintiff a

        contract offer for the 2005-2006 academic year at a salary of $43,294.00 for 200 working

        days. PEX 2 at 11.

33.     On or about the end of 2005, the ISA established an ASL department. 5/25/11 Tr. at 213;

        5/26/11 Tr. at 6.  The ISA hired Ms. Vera Blake to teach the teachers how to differentiate

        instruction between the ASL and ESL populations. 5/25/11 Tr. at 214; 5/26/11 Tr. at 6.

        Plaintiff received this training. <u>Id.</u> at 7.

<u>2006</u>

34.     On May 8, 2006, Mr. Al-Shabnan sent plaintiff a contract offer for the 2006-2007

        academic year at a salary of $44,683.00 for 200 working days. PEX 2 at 12.

35.     On June 23, 2006, plaintiff signed an "Annual Form Contract With ISA Personnel" for

        the 2006-2007 academic year at a salary of $44,683.00 for 200 working days. PEX 2 at 5.

36.     In 2006, plaintiff was given nine girls to teach ASL. 5/23/11 Tr. at 52.  Plaintiff discussed

        with her coordinator her view that she couldn't effectively teach these students because

        they didn't speak any Arabic. <u>Id.</u> at 53.

---

[4] Mr. Al-Shabnan is also referred to in the record as Mr. Abdul Shaaban (JEX 1 at 1) and Mr. Abdullah Shabnan (PEX 11 at 1).  He will be referred to in this opinion as Mr. Al-Shabnan.

37.     On October 30, 2006, plaintiff wrote a letter to Ms. Nadia Yousef,[5] Personnel Manager,

        resigning from her position as a 3rd and 4th grade Islamic Education teacher at the Girls'

        School, effective that same day. JEX 3 at 1; PEX 13 at 1.  Plaintiff further stated that she

        would continue to fulfill her duties until November 30, 2006. Id.

38.     On November 15, 2006, the ISA issued an Administrative Order acknowledging

        plaintiff's resignation and deeming it effective as of December 8, 2006. PEX 13 at 3.

39.     On December 6, 2006, plaintiff wrote Ms. Faridah Turkistani, Girls' School Principal,

        and Ms. Yousef a letter rescinding her previous resignation. PEX 13 at 5.

40.     Ms. Turkistani began working at the ISA in 2001. 5/26/11 Tr. at 17.  Two years later, she

        was promoted to Vice Principal of the Girls' School. Id. at 207-08.  One year later, she

        was promoted to Principal of the Girls' School. Id. at 208.  She is a United States citizen

        of Saudi national origin. Id. at 47.

## 2007

41.     In May of 2007, plaintiff had a discussion with Ms. Amal Rajab, an instructor at the

        Department of Arabic as a Second Language, who had posted the grades for plaintiff's

        students. 5/23/11 Tr. at 158.  Plaintiff told Ms. Rajab that she did agree with the grades

        that were given. Id.

42.     Later that month, Ms. Rajab wrote a letter to Dr. Ibrahim al-Sakaji,[6] Head of the

        Department of Arabic as a Second Language, stating that plaintiff had spoken to her in an

        "inappropriate manner" regarding the grades Ms. Rajab had given her female students.

---

[5] Ms. Yousef currently works as an administrative assistant at the ISA. 5/23/11 Tr. at 272.  She has worked at the ISA for fifteen years. Id.

[6] Dr. Sakaji is also referred to in the record as Ibrahim Hassan Hussein Sakaji. 5/26/11 Tr. at 55.

JEX 2 at 1; 5/26/11 Tr. at 148-49.  Dr. Sakaji discussed the issue with plaintiff in front of Ms. Turkistani. 5/23/11 Tr. at 158-59.

43.   Dr. al-Sakaji began working at the ISA in 1984. 5/26/11 Tr. at 56.  Prior to becoming the ASL Department Head, he taught Islamic Studies. Id. at 57.  He is originally from Jordan. Id. at 66.

44.   On May 11, 2007, Mr. Al-Shabnan sent plaintiff a contract offer for the 2007-2008 academic year at a salary of $49,597.00 for 200 working days. PEX 2 at 13.

45.   On June 28, 2007, plaintiff signed an "Annual Form Contract With ISA Personnel" for the 2007-2008 academic year at a salary of $49,597.00 for 200 working days. PEX 2 at 6.

46.   On June 28, 2007, Ms. Turkistani wrote plaintiff a letter stating that she had concerns with plaintiff's performance as a 3rd and 4th grade Islamic teacher. JEX 4 at 1; PEX 16 at 1.  She further stated that several parents had complained that she was too tough with her students, id., and that she had refused to meet with them or return their phone calls. 5/23/11 Tr. at 176.  According to Ms. Salwa Linjawi, Vice Principal of the Girls' School, a group of parents came to her office complaining that plaintiff hadn't returned her phone calls but when Ms. Linjawi called plaintiff, she refused to come meet with the parents. 5/24/11 Tr. at 216-17.

47.   Ms. Linjawi is originally from Saudi Arabia. 5/24/11 Tr. at 198.  She has worked at the ISA since 2003. Id.  Prior to becoming the Girls' School Vice Principal in 2005, she was a social studies teacher. Id. at 199, 203.  As Vice Principal, she has responsibility over grades 7-12 in the Girls' School. Id. at 214.

48.   On June 29, 2007, plaintiff responded to Ms. Turkistani's June 28, 2007, letter by refuting each of the allegations. PEX 16 at 2-3.

49.     On August 31, 2007, plaintiff wrote a note to Dr. Dawood Abdul Rahman [al-Ghofaili],[7] Head of the Islamic Education Department, stating that she could not teach the classes that had been assigned to her because there were too many students and because there were different educational levels in her class in addition to ASL. JEX 1 at 5.  See 5/23/11 Tr. at 168-69.

50.     In September of 2007,[8] Dr. al-Ghofaili sent a letter to Mr. Al-Shabnan indicating that he had informed the female teachers about the proposed coverage of the Islamic education class at the Boys' School and that one of the teachers had agreed to it while another [plaintiff] had objected. JEX 1 at 1.

51.     On September 27, 2007, Dr. al-Ghofaili issued an Administrative Decision assigning plaintiff and another individual the task of teaching Islamic Studies to the 3rd grade boys, effective September 28, 2007. PEX 11 at 1; 5/23/11 Tr. at 174.

52.     On October 1, 2007, Dr. al-Ghofaili wrote plaintiff a note warning her that refusal to teach Islamic Education at the 3rd grade level in the Boys' School was a violation of the terms of her contract. JEX 5 at 1; PEX 11 at 3.

53.     On November 16, 2007, Ms. Amina Wells Assaadi,[9] Assistant Principal in the Girls' Elementary School, sent plaintiff a note indicating that because of her increased duties in

---

[7] Dr. al-Ghofaili is also referred to in the record as Dr. Dawood Abdurahman (PEX 11 at 1) and Abdul Rahman al-Ghofaili (JEX 1 at 1).  He will be referred to in this opinion as Dr. al-Ghofaili.

[8] Where the date of a particular document is not evident on its face or the face of the certified translation, the Court relies upon the parties' joint representation as to the estimated date of the document, as stated in the index appearing in parties' joint Trial Exhibits notebook.

[9] Ms. Assaadi is also referred to in the record as Ms. al-Saadi. 5/24/11 Tr. at 152.

the Boys' School, all of her non-classroom duties during school hours would be taken away. JEX 6 at 1; 5/24/11 Tr. at 80.  Ms. Assaadi further indicated that plaintiff was still obliged to remain on car and bus duty, which were non-negotiable. JEX 6 at 1; 5/23/11 Tr. at 171; 5/24/11 Tr. at 82-83.

54.     Ms. Assaadi has been Assistant School Principal at the Girls' Elementary School for the past four years. 5/24/11 Tr. at 77-78.  Although her position has remained the same over that time, her title was previously Elementary Coordinator. Id.  As Assistant School Principal, she has responsibility over the elementary grades in the girls' school. Id. at 214.

2008

55.     On May 9, 2008, Mr. Al-Shabnan sent plaintiff a contract offer for the 2008-2009 academic year at a salary of $51,092.00 for 200 working days. JEX 7 at 1; PEX 2 at 14.

56.     On May 27, 2008, plaintiff accepted the ISA's offer. JEX 8 at 1; PEX 2 at 15.  That same day, plaintiff signed the ISA's "Right of Academic Employee to Terminate Employment Agreement". JEX 9 at 1; PEX 2 at 16.

57.     In the beginning of June, 2008, plaintiff fainted while at school. 5/27/11 Tr. at 82.  She was taken to the emergency room. Id.  The doctor told the plaintiff not to return to work for at least three days, until the results from her blood tests came back. Id.  Several days later, the doctor called the plaintiff and told her she had an adrenaline deficiency and wrote her a prescription. Id.

58.     That same week, plaintiff found out that her mother had suffered a stroke. 5/23/11 Tr. at 63.  Plaintiff called the school to let them know that she had to leave immediately for Jordan. 5/23/11 Tr. at 63, 65.

59.     Plaintiff then consulted the ISA employee handbook and learned that she was entitled to 84 days of family leave. 5/23/11 Tr. at 70.  Thereafter, she called Ms. Yousef and told her that if her leave was not approved, she would submit her resignation. 5/23/11 Tr. at 70-71.  Ms. Yousef told plaintiff that she would get back to her. Id.  That same day, plaintiff spoke to Dr. Dawood. 5/23/11 Tr. at 71.

60.     A few days later, Ms. Yousef called plaintiff back and was told that her request had been approved but that she could not be gone for more than 80 days and that Dr. al-Ghofaili had to sign off on the request. 5/23/11 Tr. at 71.  Plaintiff then told Ms. Yousef that if her mother's condition improved, she would be back sooner. Id.  Ms. Yousef told plaintiff to send them a letter with her request explaining everything and including documentation of her mother's condition. Id. at 72.

61.     In a phone call from Ms. Linjawi, Ms. Turkistani's assistant, plaintiff learned that she had permission to travel. 5/23/11 Tr. at 65.  In that phone call, plaintiff was asked by Ms. Linjawi whether she had finished preparing her students' grades. Id.  Plaintiff told her that she had and that she was planning on coming to the school the next day.

62.     On June 9, 2008, plaintiff made reservations to travel to Jordan from June 12 to August 21, 2008. JEX 11 at 1-2.

63.     On June 10, 2008, plaintiff submitted a "Request for Absence from the Academy During Work Hours" form, requesting personal leave from June 12 to June 27 for "[t]raveling for [her] mother's sake". JEX 10 at 1; 5/23/11 Tr. at 66, 275; 5/24/11 Tr. at 30-31.  Plaintiff also submitted a copy of her itinerary. JEX 11.  That same day, plaintiff's request was approved until the end of the academic year, which was at the end of June. 5/23/11 Tr. at 67.  Plaintiff was paid for this leave. 5/24/11 Tr. at 66.

11

64.     Plaintiff flew to Jordan on June 12, 2008. JEX 11 at 1-2.

65.     On June 19, 2008, plaintiff's mother was discharged from the King Abdullah University Hospital [in Jordan]. JEX 12 at 1.

66.     On June 23, 2008, plaintiff signed an "Annual Form Contract With ISA Personnel" for the 2008-2009 academic year at a salary of $51,092.00 for 200 working days. PEX 2 at 7.

67.     On July 30, 2008, plaintiff sent Ms. Yousef an e-mail stating that she had a faxed a letter requesting unpaid [leave]. JEX 13 at 1; 5/23/11 Tr. at 68.  In her letter, addressed to Mr. Adbul Rahman al-Fadili[10] and Ms. Turkistani, plaintiff stated that she had to take an emergency leave of absence to travel to Jordan to care for her mother, who had recently suffered a stroke. JEX 13 at 2.  Plaintiff also indicated in her letter that she believed, pursuant to her contract with the ISA, that she was entitled to 84 days of unpaid leave in order to care for a sick first-degree relative. Id.  Finally, plaintiff indicated that she hoped to return to her job on December 1, 2008. Id.

68.     On July 30, 2008, Ms. Assaadi wrote plaintiff a note wishing her well and stating that she looked forward to seeing plaintiff again in "October/November". JEX 13 at 5; 5/23/11 Tr. at 69; 5/24/11 Tr. at 114-15.

69.     On July 31, 2008, Ms. Yousef replied to plaintiff's e-mail and confirmed her receipt of the fax. JEX 13 at 1.  Ms. Yousef also stated that she would have a reply for her once Dr. al-Ghofaili returned, which would be on August 4, 2008. Id.

70.     In August, plaintiff send Ms. Yousef copies of her mother's medical records. 5/23/11 Tr. at 67-68.

_____

[10] Mr. al-Fadili may be the same person as Dr. al-Ghofaili.

71.     That same month, Dr. Moussa received a copy of plaintiff's employment contract for 2008-2009. 5/25/11 Tr. at 113-14.

72.     In the Fall of 2008, the ISA told plaintiff that she had to teach 5th grade Islamic Studies in English ("ISL"). 5/23/11 Tr. at 19.

73.     In the Fall of 2008, some of plaintiff's classes were assigned to Ms. Eman El-Khouly.[11] 5/24/11 Tr. at 88, 192.  First, Ms. El-Khouly was told by Ms. Al-Saadi that she would be covering plaintiff's classes for approximately two to three weeks. 5/24/11 Tr. at 152.  See also 5/25/11 Tr. at 125-26.  Later, she was told that the students would stay with her for the remainder of the year. 5/24/11 Tr. at 156-57.  See also 5/25/11 Tr. at 126.  Dr. Sakaji then took a group of students from Ms. El-Khouly's class and assigned them to plaintiff's ASL class. 5/24/11 Tr. at 158.

74.     At that same time, plaintiff was asked to teach Arabic as a Second Language ("ASL"). 5/23/11 Tr. at 22; 5/26/11 Tr. at 69.  That class was comprised of eight students at three different proficiency levels, including one student who needed special education instruction. 5/23/11 Tr. at 22-24.  Plaintiff did not have any training in special education. Id. at 24.  Plaintiff met at least five times with Mr. Ahmad al-Melhem, Principal of the Boys' School,[12] to ask for help teaching her ASL class. Id. at 59.

75.     Mr. al-Melhem is originally from Saudi Arabia. 5/25/11 Tr. at 44.  He is an employee of the Ministry of Education of Saudi Arabia. Id. at 46.

---

[11] Ms. El-Khouly is married to Dr. Moussa. 5/25/11 Tr. at 85.

[12] 5/25/11 Tr. at 6.

76.     On September 5, 2008, the ISA issued an Administrative Decision granting plaintiff

        unpaid family leave to begin on September 1, 2008 for a period not to exceed 84 days.

        JEX 70 at 1; 5/23/11 Tr. at 75; 5/24/11 Tr. at 28.  The decision was signed by Dr. al-

        Ghofaili. JEX 70 at 1.

77.     On October 10, 2008, plaintiff sent Dr. Sakaji a letter stating that she would not be able

        to attend her [ASL] class. 5/23/11 Tr. at 179.

78.     On October 15, 2008, plaintiff returned to school and signed an "Annual Form Contract

        With ISA Personnel." JEX 14 at 1.  See 5/23/11 Tr. at 76; 5/24/11 Tr. at 68.

79.     On October 29, 2008, plaintiff made her airline reservations to travel to Jordan on

        December 18, [2008]. JEX 15 at 1; 5/23/11 Tr. at 81.  She paid $4,200 for her ticket.

        5/23/11 Tr. at 255.

80.     On or about October 31, 2008, plaintiff was given her final class schedule. 5/23/11 Tr. at

        26; JEX 69.  Plaintiff was scheduled to teach the following: 1) Islamic to 9th grade girls -

        taught in English; 2) Islamic to 4th and 5th grade girls - taught in English; 3) Arabic as a

        second language - taught in English; 4) Islamic to 6th grade girls - taught in Arabic; and

        5) Islamic to 5th grade boys - taught in English. 5/23/11 Tr. at 26; 5/26/11 Tr. at 70.

81.     On October 31, 2008, Dr. Sakaji sent plaintiff a letter regarding her class schedule. JEX

        16 at 1; 5/23/11 Tr. at 36, 186.  See 5/26/11 Tr. at 69-70.  In the letter, he indicated that

        the approved schedule would take affect on November 3, 2008, and that he wanted to

        meet with plaintiff on that date in the library during second period. JEX 16 at 1; 5/26/11

        Tr. at 71.  Specifically, plaintiff was to begin teaching a 5th grade ASL class on that date.

        5/23/11 Tr. at 36.

14

82.   After receiving her schedule, plaintiff went to see Ms. Assaadi and told her that she did

      not want to teach the ASL class. 5/23/11 Tr. at 45; 5/24/11 at 96.  Ms. Assaadi told

      plaintiff to speak to Ms. Linjawi. Id.

83.   Plaintiff went to see Ms. Linjawi and repeated her request to exchange the assigned ASL

      class with another ISL class. 5/23/11 Tr. at 45.  Ms. Linjawi said they could raise the

      issue with Dr. Sakaji at the meeting scheduled for November 3, 2008. Id.

84.   On November 3, 2008, a meeting was held in the school library. 5/23/11 Tr. at 46.  In

      attendance were plaintiff, Dr. Sakaji, Ms. Linjawi and Ms. Assaadi. Id.; 5/24/11 Tr. at

      103.  At the meeting, Dr. Sakaji told plaintiff that she could either accept the schedule in

      its entirety or reject it in its entirety. 5/23/11 Tr. at 47.

85.   Despite plaintiff's objections to teaching the ASL class, she continued to do so. 5/23/11

      Tr. at 48.

86.   On the morning of November 10, 2008, plaintiff sent Dr. Sakaji a letter telling him that

      she would not be able to cover her 5th period class. 5/23/11 Tr. at 30.  She copied the

      Principal and Assistant Principal for the Girls' School. Id.

87.   On November 10, 2008, Ms. Margaret O'Neill,[13] the Boys' Elementary School

      Coordinator, wrote Dr. Sakaji a note indicating that plaintiff did not cover her 5th period

      class, which was a 2nd and 3rd grade ASL class. JEX 17 at 1; 5/26/11 Tr. at 75, 80.  Ms.

      O'Neill further stated that Ms. Asma Hindi[14] covered the class. 5/25/11 Tr. at 54-55, 63.

---

[13] While at the ISA, Ms. O'Neill has taught first and fifth grades and was an Elementary
Coordinator. 5/27/11 Tr. at 23.  She has been teaching for forty years and has two masters
degrees. Id. at 23-24.  She is currently teaching ESL or English as a Second Language. Id. at 22.

[14] Ms. Hindi's full name is identified in the parties Joint Pretrial Statement Pursuant to Local
Civil Rule 16.5 [#47] at 15.  In that document, her first name is identified as Asma'a.

88.     On November 10, 2008, Dr. Sakaji wrote plaintiff a letter following up on the November

        3, 2008, meeting. JEX 18 at 1; 5/26/11 Tr. at 75, 81-82.  In the letter, Dr. Sakaji indicated

        that he appreciated plaintiff's reservations about teaching a multi-level class and

        suggested that she might be able to receive helpful teaching materials from [the ISA's]

        Department of Education. JEX 18 at 1.  He further stated that he learned of her failure to

        cover her 5th period class and that he wanted to meet with her again on November 14,

        2008,[15] in the library during 2nd period. Id.; 5/26/11 Tr. at 87-88.  The two did not meet

        on that date. 5/23/11 Tr. at 49; 5/26/11 Tr. at 89.

89.     On November 21, 2008, plaintiff met with Mr. al-Melhem and told him that she could not

        teach her assigned classes. 5/23/11 Tr. at 31.  He asked her to continue to cover her

        classes for a few weeks. Id. at 181; 5/25/11 Tr. at 17, 22-23, 63-64.

90.     On November 21, 2008, Dr. Sakaji wrote plaintiff a note asking to meet with her on

        November 24, 2008, during 2nd period to discuss action plans and curriculum. JEX 19 at

        1.

91.     On November 21, 2008, Dr. Sakaji wrote Ms. Assaadi a note stating that on that day,[16] he

        had stopped by plaintiff's 3rd period class to find that she was not there. JEX 22 at 1;

        5/26/11 Tr. at 106-07.  Dr. Sakaji also asked Ms. Assaadi to discuss the situation with

        plaintiff. JEX 22 at 1.

_____

[15] During his testimony, Dr. Sakaji indicated that although the letter requested a meeting on
November 15, 2008, he meant to write November 14, 2008, which was a Friday. 5/26/11 Tr. at
89.

[16] During his testimony, Dr. Sakaji indicated that although the letter indicated that he had
stopped by plaintiff's classroom on November 28, 2008, which was a holiday, he meant to write
November 21, 2008. 5/26/11 Tr. at 114.

16

92.    On November 24, 2008, plaintiff met with Dr. Sakaji as arranged. 5/23/11 Tr. at 50-51.

93.    On November 24, 2008, plaintiff had a doctor's appointment, which necessitated her
       leaving the school at 11:00 a.m. 5/23/11 Tr. at 32, 197-98.  Her leave request pertaining
       to this appointment was approved by Ms. Assaadi and another individual. Id. at 33.

94.    That same day, Ms. O'Neill wrote Dr. Sakaji a note stating that on November 21, 2008,
       plaintiff failed to cover her 5th period class but did cover her 8th period class. JEX 20 at
       1; 5/26/11 Tr. a 102.  Ms. O'Neill also stated that on the morning of November 24, 2008,
       she was informed that plaintiff would not cover her 8th period class that day and that
       later in the day, she was informed that plaintiff would also not be covering her 5th period
       class, leaving Ms. O'Neill to cover the 5th period class. JEX 20 at 1.

95.    On November 25, 2008, Dr. Sakaji wrote plaintiff a letter regarding her absences on
       November 21 and 24, 2008, and on one other date. JEX 21 at 1; 5/26/11 Tr. at 117-18.
       Dr. Sakaji warned plaintiff that it was her responsibility to get approval from the
       department head if she planned to miss any classes. JEX 21 at 1.  He also indicated that
       unless she followed the class schedule, she would have to be removed from the ASL
       Department. Id.  Finally, he noted that he still did not have her lesson plans or goals for
       her ASL class. Id.

96.    According to plaintiff, out of the 163 periods assigned to her between October 15, 2008,
       and December 18, 2008, she missed 4½ periods. 5/23/11 Tr. at 41.

97.    In 2008, plaintiff had to prepare materials for her students in English, as opposed to
       Arabic, as in previous years. 5/23/11 Tr. at 42.

98.    Plaintiff worked more than 1,250 hours prior to her December 1, 2008 leave request.
       5/23/11 Tr. at 44.

99.     On December 1, 2008, plaintiff submitted a "Request for Absence from the Academy
        During Working Hours", seeking three days leave to travel from December 19 through
        December 23, 2008. JEX 23 at 1; 5/23/11 Tr. at 79.  Plaintiff submitted her leave request
        to Ms. Assaadi. 5/23/11 Tr. at 79, 201.  Ms. Assaadi returned the request to plaintiff with
        a note on it saying that it couldn't be approved. JEX 23 at 1; 5/23/11 Tr. at 80; 5/24/11
        Tr. at 117-19.  When asked by plaintiff why the request couldn't be approved, Ms.
        Assaadi said that there were other teachers traveling during that time. 5/23/11 Tr. at 80-
        81.  Ms. Assaadi also sent plaintiff another note on December 1, 2008, stating that no
        leave was being approved for the week of December 15 through 19 because the school
        didn't have enough coverage. JEX 25 at 1.

100.    That same day, Dr. Sakaji wrote a memo to Ms. Turkistani and Mr. al-Melhelm inviting
        them to a meeting to be held on December 1, 2008 at 10:30 a.m. to discuss "Sonia
        Ghawanmeh's situation." JEX 26 at 1.

101.    That same day, Mr. al-Melhelm wrote plaintiff a memo regarding her class schedule.
        JEX 27 at 1; 5/26/11 Tr. at 134.  In the memo, he indicated that she must "abide by the
        schedule that was assigned to her from the date thereon, and must coordinate with the
        Head of the ASL Department in order to implement the action plans, obtain the
        curriculum, and overcome the difficulties that might be faced in the classroom [and that
        she] may not, under any circumstances, leave the classroom unless authorized by the
        school's administration and in coordination with the Department Head." JEX 27 at 1;
        5/25/11 Tr. at 65-66; 5/26/11 Tr. at 188-89.

102.    After plaintiff's leave request was denied on December 1, 2008, she tried to change her
        flight reservations but was unable to. 5/23/11 Tr. at 232.

18

103.   On December 2, 2008, plaintiff submitted a second leave request. JEX 24; 5/23/11 Tr. at
       83.  This one was also denied by Ms. Assaadi. 5/23/11 Tr. at 83.  This request sought
       leave on December 22 and 23, 2008. Id.  Ms. Assaadi later told plaintiff to speak with
       Ms. Yousef. 5/23/11 Tr. at 86.

104.   Ms. Yousef told plaintiff that her request could not be approved because she had already
       used all of her leave. 5/23/11 Tr. at 87, 208-09.  Ms. Yousef gave plaintiff a different
       form so that she could request leave without pay. Id. at 209; JEX 31; 5/24/11 Tr. at 27-
       28, 33.

105.   On December 2, 2008, plaintiff got a message that Dr. al-Ghofaili wanted to meet with
       her during fifth period. 5/23/11 Tr. at 35.  Plaintiff told the secretary that she had a class
       to teach but the secretary indicated that it would be taken care of. Id.  At the meeting, Dr.
       al-Ghofaili told plaintiff that if she continued teaching the ASL class until after the
       winter break, he would resolve the issue personally. Id. at 60-61.

106.   On December 2, 2008, plaintiff attended all of her classes except for 5th period. 5/23/11
       Tr. at 34.

107.   That same day, Dr. Sakaji wrote a memo to Ms. Turkistani and Mr. al-Melhem noting
       that plaintiff had not covered her 5th period class on December 2, 2008. JEX 28 at 1;
       5/25/11 Tr. at 66-67.  Mr. al-Melhem later told Dr. al-Ghofaili what had happened.
       5/25/11 Tr. at 69.

108.   On December 17, 2008, Ms. O'Neill wrote Dr. Sakaji a letter relating events that had
       happened earlier that day. JEX 29 at 1.  According to Ms. O'Neill, plaintiff gave Ms.
       Hindi a letter and a packet, which Ms. Hindi then gave Ms. O'Neill. Id.  Ms. O'Neill then
       contacted Ms. Yousef, who told Ms. O'Neill not to accept it because the forms didn't

have the requisite signatures. Id.; 5/26/11 Tr. at 225-26.  Ms. O'Neill then expressed her

concern that plaintiff's refusal to teach a certain class was disruptive to the atmosphere in

both the Boys' and Girls' Schools and that the ISA needed to adopt a uniform policy for

both schools. JEX 29 at 1.  See also 5/27/11 Tr. at 53-57.

109.    After sending out the December 17, 2008 letter, Ms. O'Neill was contacted by Dr. al-

Ghofaili, who told her he would look into getting her coverage for various classes,

including plaintiff's. 5/27/11 Tr. at 58.

110.    As of December 18, 2008, plaintiff was entitled to take 8.46 hours of personal leave.

5/24/11 Tr. at 50.  See generally id. at 38-53.

111.    On December 18, 2008, plaintiff again submitted a "Request for Absence" form seeking

three days leave to travel from December 19-23, 2008 to visit her sick mother. JEX 30 at

1; 5/23/11 Tr. at 87-88.  Plaintiff first submitted this request to Ms. Assaadi, but she was

absent that day. Id.  Plaintiff next submitted it to Ms. Layla, who later told plaintiff that

she could not approve it. Id.  Later, Ms. Turkistani wrote a note at the bottom of the

request, stating that the leave request was being denied because plaintiff had already used

up all of her leave. JEX 30 at 1; 5/23/11 Tr. at 90-91; 5/24/11 Tr. at 26; 5/26/11 Tr. at 34-

35.

112.    Plaintiff then submitted a "Request for Leave Without Pay" form seeking leave from

December 19-23, 2008. JEX 31 at 1.  She gave that form to Ms. Layla. 5/23/11 Tr. at

212-13.

113.    That same day, plaintiff submitted a form requesting a half day of sick leave, beginning

at 1:00 p.m. JEX 64 at 7; 5/23/11 Tr. at 215.  That night, she flew to Jordan. 5/23/11 Tr.

at 215.

114.   For the three days plaintiff sought leave, she prepared files for each of her students. 5/23/11 Tr. at 93.   Plaintiff gave some of the files to the individual students and left the others with the secretaries of the Boys' and Girls' Schools. Id.; 5/25/11 Tr. at 40-42.

115.   Plaintiff also wrote Dr. Sakaji a note stating that, for personal reasons, she would not be at school on December 19, 22, and 23. JEX 32 at 1; 5/23/11 Tr. at 94, 98.   She further indicated that she would provide her students with materials to work on in her absence and would leave copies of those materials in the office for the substitute teachers. JEX 32 at 1.

116.   Some of the secretaries told plaintiff that Dr. Sakaji refused to take her student files. 5/23/11 Tr. at 95.   Plaintiff then went to to Mr. Al-Melhem for assistance. Id.   He told plaintiff to leave the files with Ms. Sawsan Ibrahim, the secretary for the Boys' School. Id.

117.   On October 31, 2008, Mr. Al-Muhanna, the ISA's Business Manager, issued a memorandum reminding employees of the ISA's sick leave and personal leave regulations. JEX 48 at 1.   According to the memorandum, the ISA provided full time employees under contract with seven days (56 hours) of sick leave annually, and 3 days (24 hours) of personal leave annually. Id.

118.   On December 19, 2008, the ISA sent plaintiff's attendance sheet and her December 18, 2008, leave request home with her daughter. 5/23/11 Tr. at 141; 5/26/11 Tr. at 40; 5/27/11 Tr. at 99; JEX 30 at 1.

119.   On December 22, 2008, Dr. Sakaji wrote Dr. al-Ghofaili a letter regarding plaintiff's absences and the affect they were having on the other instructors. JEX 33 at 1; 5/26/11

Tr. at 194-95.  Dr. Sakaji then requested that she be dismissed, citing nine specific examples of "work-related violations." JEX 33 at 1-2.

120. On December 22, 2008, Ms. O'Neill wrote Dr. al-Ghofaili a note stating that plaintiff had not covered her Boys' School ASL or ISL classes and that it was Ms. O'Neill's understanding the plaintiff would be out of the country until January 5, 2009. JEX 34 at 1.  Ms. O'Neill further stated that if the ISA planned on letting her go, they had to send her a signed certified letter prior to January 5. Id.  See also 5/27/11 Tr. at 66-67.

121. December 23 was the last day of school in 2008. 5/23/11 Tr. at 227.  On that date, Ronald H. Schultz, Director General of the ISA, was informed by Dr. al-Ghofaili that he had some concerns about plaintiff. 5/23/11 Tr. at 267; JEX 47.

122. Mr. Shultz has been Director General since October of 2009. 5/23/11 Tr. at 258.  Prior to being appointed Director General, he worked at the ISA as Assistant Principal in the Boys' School. Id.  He has a Ph.D in educational administration. Id. at 257.

123. On or about December 23, 2008, a committee of the ISA made the decision to terminate plaintiff. 5/23/11 Tr. at 285, 288; 5/24/11 Tr. at 4.  That committee was comprised of 1) Dr. al-Ghofaili; 2) Ms. Turkistani; 3) Dr. Sakaji; and 4) Ms. An-Haly, the elementary coordinator for the boys' school. 5/23/11 Tr. at 285-86.

124. On December 30, 2008, Dr. Ibrahim Shabib, an OBGYN doctor in Irbid, Jordan, wrote a letter "to whom it may concern" regarding plaintiff's condition. JEX 35 at 1.  According to Dr. Shabib, plaintiff came to see him on December 27, 2008, after which he determined that plaintiff needed to have her uterus removed immediately. Id.  The surgery was postponed, however, because plaintiff had the flu and a bad cough. Id.  The

doctor also noted that plaintiff would need approximately 3-4 weeks to recover from the surgery and that she should not travel during that time period. Id.

2009

125. Following the winter break in December, 2008, George Tenery, Vice Principal of the boys' school, wrote Ms. Yousef a note stating that he and Ms. O'Neill had come to speak with her about plaintiff and also that he and Mr. Schultz had already discussed the situation with Dr. al-Ghofaili. 5/24/11 Tr. at 11-12; JEX 47.

126. On January 5, 2009, plaintiff wrote a letter to Dr. al-Ghofaili regarding the emergency surgery she underwent in Jordan on January 4, 2009.[17] JEX 36 at 1.  Plaintiff also asked him if she could have one month of leave beginning on January 3. Id.  Finally, plaintiff noted that she had enclosed her medical reports with the letter. Id.  In a handwritten note at the bottom of the letter, Dr. al-Ghofaili stated that there was an urgent need to obtain a substitute. Id.; 5/23/11 Tr. at 6-7.

127. Plaintiff's husband delivered plaintiff's letter to Dr. al-Ghofaili that same day. 5/23/11 Tr. at 106.

128. On January 12, 2009, Dr. al-Ghofaili sent plaintiff a letter notifying her that she was being terminated, effective immediately. JEX 37 at 1.  The letter also stated that her last day of work would be December 18, 2008, and that she would be paid up until January 30, 2009. Id.

---

[17] In January of 2008, plaintiff's doctors told her she needed to get a hysterectomy. 5/27/11 Tr. at 152.  Originally, plaintiff scheduled to have the surgery in the summer of 2008. Id.  When her mother became ill that summer, plaintiff postponed the surgery. Id.  In January of 2009, while in Jordan caring for her mother, plaintiff's condition worsened and she had to have the surgery in Jordan on an emergency basis. Id.

129.   In mid-January, 2009, Ms. O'Neill learned that another teacher was covering plaintiff's classes. 5/27/11 Tr. at 17.  She was never informed that plaintiff had been fired. Id. at 21.

130.   On or around January 18, 2009, plaintiff, who was recovering from her surgery in Jordan, received a phone call from her husband and daughter, who were both in the United States. 5/23/11 Tr. at 107.  They informed plaintiff that they had received a termination letter from the ISA. Id.

131.   On January 21, 2009, plaintiff returned to the United States. 5/23/11 Tr. at 107.

132.   On January 21, 2009, the ISA issued an Administrative Decision "end[ing] the ties" between the school and plaintiff, starting on January 30, 2009. JEX 71 at 1.

133.   That same day, Dr. Moussa received a copy of plaintiff's letter of termination. 5/25/11 Tr. at 110-11.

134.   Plaintiff was terminated with cause. 5/24/11 Tr. at 21.  She received one month's notice and one month's salary following her termination. Id.

### CONCLUSIONS OF LAW

At trial, the issues before the Court were 1) whether the ISA violated plaintiff's rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*,[18] when it denied various leave requests and ultimately fired her; 2) whether the ISA violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, when it discriminated against her based on her national origin; 3) whether the ISA breached plaintiff's employment contract when it fired her without cause; and 4) whether the ISA slandered plaintiff.

---

[18] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

Second Amended Complaint [#20-2]; Joint Pretrial Statement Pursuant to Local Civil Rule 16.5

[#47] at 1-2.  Each will be considered in turn.

I.      Plaintiff's FMLA Claim

        "Two distinct types of claims are recognized under the FMLA: (1) 'interference claims,

in which an employee asserts that his employer denied or otherwise interfered with his

substantive rights under the Act,' and (2) 'retaliation claims, in which an employee asserts that

his employer discriminated against him because he engaged in activity protected by the Act.'"

Deloatch v. Harris Teeter, Inc., ___ F. Supp. 2d ___, 2011 WL 2750941, at *11 (D.D.C. 2011)

(internal quotations and citations omitted).  See also Breeden v. Novartis Pharmaceuticals Corp.,

646 F.3d 43, 49-55 (D.C. Cir. 2011).  Plaintiff asserts both types of claims.  First, plaintiff claims

that the ISA interfered with her rights under the FMLA when it denied certain leave requests.

Second, plaintiff claims that the ISA retaliated against her for exercising those rights when it

ultimately fired her.  Before reviewing the merits of plaintiff's FMLA claims, however, the

Court must determine whether the ISA qualifies as an "employer" and plaintiff qualifies as an

"employee" under the FMLA.

        A.      The Parties' Qualifications under the FMLA

        Under the FMLA, an employer "means any person engaged in commerce or in any

industry or activity affecting commerce who employs 50 or more employees for each working

day during each of 20 or more calendar workweeks in the current or preceding calendar year."

29 U.S.C. § 2611(3)(A)(I).  In this case, it is undisputed that the ISA employs more than 50 full-

time employees.  See [#63] at 3 ("The ISA had more than 50 full-time employees during the

time period in which it employed Plaintiff."); 5/23/11 Tr. at 273 (Ms. Yousef testified that the

ISA currently has between 150-170 employees and had between 170-175 in 2008.).  The next issue is whether plaintiff qualifies as an "employee."

In order to qualify as an "eligible employee" under the FMLA, plaintiff must have been employed "(i) for at least 12 months by the employer with respect to whom leave is requested . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).  In her first complaint, plaintiff failed "to make any mention whatsoever of her status as an 'eligible employee' under the FMLA" and the Court therefore granted the ISA's motion to dismiss as to plaintiff's FMLA claims.  See Ghawanmeh v. Islamic Saudi Academy, 672 F. Supp. 2d 3, 14 (D.D.C. 2009).  In her most recent complaint, plaintiff claims the following:  1) "Plaintiff was, in the 12 month period prior to her exercising FMLA leave, a full-time schoolteacher at Defendant ISA"; and 2) "During said 12-month period, Plaintiff worked 1107.7 hours that were logged at school . . . worked an additional 685 hours at home and on the weekends that were not logged at school, for a total of 1792.7 hours." [#20-2] at 7.  The ISA does not dispute plaintiff's status as an eligible employee under the FMLA.  See generally [#63] at 35-47.  Having determined that both parties are covered by the FMLA, the Court must next determine whether plaintiff has proven either or both of her FMLA claims.

B.    Interference Claim

The FMLA entitles an eligible employee to take "a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).  The FMLA also states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided . . . ." 29 U.S.C. § 2615(a)(1).  "In order to establish an interference claim under FMLA, a plaintiff must

prove, *inter alia*, that (1) the plaintiff was entitled to take leave because he or a family member had a 'serious health condition,' (2) the plaintiff provided the defendant with adequate notice of his or her intention to take leave and (3) the defendant interfered with the plaintiff's right to take leave." Deloatch, 2001 WL 2750941, at *12 (citing 29 U.S.C. §§ 2611, 2612, 2615).

Plaintiff advances two theories in support of her claim that the ISA interfered with her FMLA rights when it denied her request for leave in December of 2008. Plaintiff's Proposed Findings of Fact and Conclusions of Law [#64] at 3. On the one hand, plaintiff claims that, under a "bank account" theory, because she did not use the full 84 days of leave that she was granted in the Fall of 2008, she was entitled to use that leave at a later time during the 2008-2009 academic year. Id. Alternatively, plaintiff claims that, under a "new leave" theory, her previous leave grant was extinguished when she returned to work on October 15, 2008, but she was entitled to make a new request for leave. Id.

First, I find no credible evidence whatsoever that either plaintiff or the defendant understood that she intended to reserve any of the FMLA leave she had been granted when the defendant granted her 84 days of leave beginning on September 1, 2008. See JEX 70. To the contrary, she returned from that leave earlier than anticipated and never said a word to her employer that she was reserving whatever remained of the 84 days for subsequent use. Nor did she ever claim that she had reserved any of the leave granted her on May 9, 2008, by the document that is JEX 70, when she demanded that she be permitted leave in December, 2008. I find that the "bank account intermittent leave" theory is a *post hoc*, artificial reconstruction of what never really happened–plaintiff demanded to use some of the leave she had supposedly reserved when she returned to work in the fall of 2008.

27

Second, and irrespective of how plaintiff characterizes her request for leave in December of 2008, plaintiff never adequately conveyed to the appropriate personnel at the ISA that she was specifically seeking to invoke her rights under the FMLA.  In short, plaintiff failed to provide the ISA with adequate notice of her intention to take FMLA leave.

In June of 2008, when plaintiff first requested permission to travel to Jordan, the ISA was aware that the purpose of plaintiff's trip was to care for her mother.  The form that the plaintiff submitted on June 10, 2008, to the ISA expressly indicated that she would be "[t]raveling for [her] mother's sake." JEX 10 at 1.  See 5/23/11 Tr. at 66, 275; 5/24/11 Tr. at 30-31.

In July of 2008, while plaintiff was still in Jordan, she again requested leave and again made it clear to the ISA that the purpose of her request was to continue caring for her mother. See JEX 13 at 1 ("I have examined the Academy's Contract Guide and found a clause that states that a person who is under contract with the Academy is entitled to receive a 84-day unpaid leave of absence in order to care for a sick first-degree relative.").  In addition, in August, plaintiff followed up on her request for leave to care for her mother by sending Ms. Yousef copies of her mother's medical records. 5/23/11 Tr. at 68; 5/24/11 Tr. at 67.  In December of 2008, however, when plaintiff requested leave for a third time, she did not make it clear to the ISA that she was again seeking to invoke her rights under the FMLA, either by stating so explicitly or by providing the ISA with additional documentation regarding her mother's condition.

Plaintiff returned to the United States in mid-October of 2008.  At that point in time, she had used 33 of the 84 days of FMLA leave that she had previously been granted.  On October 29, 2008, plaintiff decided to return to Jordan and made airline reservations to travel on December 18, 2008. JEX 15 at 1.  Plaintiff waited, however, until December 1, 2008 to submit a

request for leave.  On that date, she submitted a "Request for Absence from the Academy During Working Hours," seeking three days leave to travel from December 19 through December 23, 2008. JEX 23 at 1.  That request was denied on the grounds that other teachers were traveling during that period and ISA lacked sufficient coverage to grant plaintiff's request. JEX 25 at 1; 5/23/11 Tr. at 80-81.  In response to the denial, plaintiff tried to change her reservations but was unable to. 5/23/11 Tr. at 232.

On December 2, 2008, plaintiff submitted a second leave request. JEX 24.  This time, plaintiff sought leave on December 22 and 23, 2008. JEX 24.  Again, that request was denied on the grounds that leave requests for the week of [sic] December 15-19, 2008 would not be approved. JEX 25.  Plaintiff was also told that her request could not be approved because she had already used all of her leave. 5/23/11 Tr. at 87, 208-09.  Plaintiff was then given a different form so that she could request leave without pay. Id. at 209; JEX 31.

On December 18, 2008, plaintiff submitted a third request, this time seeking three days leave to travel from December 19-23, 2008 to visit her sick mother. JEX 30 at 1; 5/23/11 Tr. at 87-88.  That request was denied on the grounds of plaintiff's "late attendance" and "as a result of not complying with attending the final semester." JEX 30 at 1.

That same day, plaintiff submitted a fourth and fifth request, first seeking leave without pay for December 19-23, 2008 (JEX 31 at 1) and then seeking a half day of sick leave, beginning at 1:00 (5/23/11 Tr. at 215).

Of the five requests submitted by plaintiff in December of 2008, only her third request, dated December 18, 2008, referenced her need to travel to visit her sick mother.  In light of the fact that this was plaintiff's third request for leave in December of 2008, however, this request

was not understood by the ISA as being a request for leave under the FMLA, as illustrated by the

following exchange at trial between plaintiff's counsel and Ms. Yousef:

> A.   ... December 18th, she [plaintiff] submitted another form like she is traveling for sick or sick mother or something like that.  So she was confused in submitting the leave itself.  If you want to travel, as I told you, the policy in the academy, if you want to extend the holiday, assigned holiday in the calendar, you have to justify it with documents.  Like submit the form, yes, but you need a doctor note if you are sick.  If you have any other reason, you have to submit a document supporting what the reason you are leaving.  For her, she did not do anything.

> Q.   Well, that's not what you said yesterday.  Yesterday you said that she did submit - - that you received medical documentation from her just a few months before.  Right?

> A.   No, that was for the first leave, which was in June.  This is separate leave.  You are talking about two separate leave.  The June leave, it was approved.  We had no problem with that.  She extended and she got it, and she came back earlier, middle of October.  This is the second leave, which is the December leave.  That's the argument about it.

> Q.   So it's your testimony, then, that you didn't know that the leave was actually for medical purposes?

> THE COURT:       Which leave?

> MR. AHMAD:       I'm sorry, let me clarify.

> BY MR. AHMAD:

> Q.   The leave requests that she submitted in December of 2008, did you know at that time that that was for medical reasons?

> A.   No.  Because as I told you, she was confused.  She submit December 1st applying for these days for travel; another letter, she submitted it for the department head for personal leave.  She came to my office, she got two form, and she submit the two form.  The first form, leave during work hours, a sick leave form; the other one, unpaid leave.  She

> submit both of them.  Even the unpaid leave, there is rules
> governing these leaves.  But for her, she did not even
> specify why she is leaving in that form.

5/24/11 Tr. at 26-28.

Thus, although plaintiff referenced the need to care for her mother in her third request,

the fact that she had previously submitted two other requests seeking leave for different reasons

made it unclear to Ms. Yousef why she was seeking leave and resulted in the denial of the

request.  Even though the FMLA does not require that an employee making a first time request

for leave to specifically reference the FMLA, "[w]hen an employee seeks leave due to a FMLA-

qualifying reason for which the employer has previously provided FMLA-protected leave, the

employee must specifically reference the qualifying reasons for leave or the need for FMLA

leave." 29 U.S.C. § 825.302(c).

I therefore must find that plaintiff never complied with this obligation.  I credit entirely

Ms. Yousef's testimony that she did not understand that plaintiff was seeking leave under the

FMLA.  I further find that Ms. Yousef's interpretation of plaintiff's multiple leave requests is

credible and understandable, because plaintiff was seeking to take leave just prior to the Winter

holidays, a time when many teachers sought time off.

Finally, I find 1) that plaintiff never intended to invoke her rights under the FMLA, 2)

that she believed that she should be permitted to take the leave she had planned to take when she

booked the flight to Jordan in the Fall, 3) that she was angry when she was not permitted to take

that leave, and 4) that she walked off her job knowing full well that she had no right to take the

leave she was going to take whether her superiors liked it or not.  Ultimately, I find that her

assertion that she intended to take FMLA leave to be a *post hoc* rationalization for her behavior

and I discredit any claim or testimony that she has offered to the contrary.

C.      Retaliation Claim

In addition to prohibiting an employer's interference with an employee's exercise of FMLA rights, the Act also prohibits an employer from retaliating against an employee who exercises those rights: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2).  In order to prevail, plaintiff must show that she exercised her rights under the FMLA, that she suffered an adverse employment action, and that the two were causally connected.

It is clear from the ISA's granting plaintiff FMLA leave in the Fall of 2008 that she successfully exercised her rights under the FMLA.[19]  It is also clear that her firing in January of 2009 qualifies as an adverse employment action.  But, if the ISA had a legitimate reason to fire her and that reason was not a pretext for retaliation, her claim fails.  See Dorsey v. Jacobson Holman, PLLC, 756 F. Supp. 2d 30, 37 (D.D.C. 2010) ("Defendants were legally within their right to terminate Plaintiff after she had expened her allotted medical leave and she remained absent from work.").  I find that the reasons provided for firing plaintiff were true and there is no evidence whatsoever that they were a pretext for retaliation against her.

The ISA's January 21, 2009, Administrative Decision No. 5, the document that officially terminated plaintiff's employment with the ISA, cites "the recommendation of the Director of the Girls Section [Ms. Turkistani] and Head of the Primary School at the Boys Section [Mr. al-Melhelm], pursuant to the Head of the ASL Department [Dr. Sakaji]."  See JEX 71 at 1.  These

---

[19] As discussed above, because plaintiff did not adequately inform the ISA of her desire to take FMLA leave in December of 2008, the only exercise of her rights under the FMLA that is at issue in her retaliation claim occurred in the Fall.

are the three individuals who met on December 1, 2008 to discuss "Sonia Ghawanmeh's situation."  See JEX 26 at 1.  Following that meeting, on December 22, 2008, Dr. Sakaji sent a letter to Dr. al-Ghofaili, the author of the Administrative Decision, citing nine examples where plaintiff violated the ISA's policies.  See JEX 33 at 1-2.  They were as follows:

1.  Refusal to teach the fifth class period at the Boys School for more than five weeks.

2.  She did not comply with the Academy-approved curriculum, especially with respect to the Islamic Education and Arabic Language courses.

3.  She did not provide any course outline for the previous period.

4.  She did not let me work with her in order to design a course plan and curriculum.

5.  She did not comply with the administrative decisions issued by the Department Head or the Girls School and Boys School Principals.

6.  She did not comply with the Academy's regulations concerning the procedure for obtaining a leave from the Academy and the need to have the immediate supervisor's signature for that, as happened on Thursday, December 18, 2008, when she left work without my prior knowledge.

7.  She interfered in the Administration's work and in the appointment by the Department Head of a few members of the teaching staff to cover her classes when she was traveling, as she asked instructor Fatma Aziz to take the female students and gave her course materials.  She did the same thing at the Boys School.  Also, on Thursday, December 18, 2008, she asked instructor Ahmed Almaz to cover her eighth class period.

8.  She tried to meddle in the affairs of a female teaching staff by inquiring about their degrees and their experiences. This created anxiety among the female instructors, especially since she challenged their competence.

9.      I am sorry to say that she was not honest when she
        submitted to the Girls School a request for a leave from the
        Academy, stating that she was sick.  In fact, she intended
        something else as she traveled outside the United States,
        something I learned from a few female instructors.

JEX 33 at 1-2.

At trial, although plaintiff disputed Dr. Sakaji's characterization of several of the

examples provided by him in his letter to Dr. al-Ghofaili, she nevertheless failed to offer any

evidence whatsoever to refute his most significant claims–that she refused to teach the fifth

period class in the Boys' School and that she failed to follow the ISA's procedure for requesting

leave prior to her departure from the country on December 18, 2008.  For those reasons alone,

the ISA was justified in dismissing her, and I therefore must find that she was dismissed for

cause and not in retaliation for the legitimate exercise of her rights under the FMLA in the

Summer of 2008.

II.     Plaintiff's Title VII Claim

Under Title VII, an employer may not "fail or refuse to hire or to discharge any

individual, or otherwise discriminate against any individual with respect to his compensation,

terms, condition, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin."42 U.S.C. §§ 2000e - 2(a)(1).

It is undisputed that plaintiff suffered an adverse employment action when she was

fired.[20]  "[A]n employee suffers an adverse employment action if he experiences materially

---

[20] Plaintiff also argues in her proposed findings that she suffered the adverse action of being
"returned to a non-equivalent position" when she returned to ISA after taking FMLA leave.
[#64] at 9.  But, plaintiff never pleaded this claim in her Second Amended Complaint ([#20-2] at
¶¶ 50-54) nor in her section of the Joint Pretrial Statement where she specified her claims. [#47]
at § 2.1.  She therefore may not make that claim now.  In any event, even if she could, I would
find that the assignments given her when she returned early from her leave were not in any way

34

adverse consequences affecting the terms, conditions, or privileges of employment or future

employment opportunities such that a reasonable trier of fact could find objectively tangible

harm." <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (internal citations omitted).

Being fired is the most adverse of employment actions an employee could suffer.  <u>See</u>

<u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998) ("A tangible employment action

constitutes a significant chance in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits.").

    As just explained, I find that the ISA fired the plaintiff because she failed to cover her

assigned classes and because she failed to follow the proper procedure on December 18, 2008 in

requesting leave.  On the other hand, I find no evidence whatsoever that the reasons for firing her

were pretextual.  Furthermore, I find no evidence whatsoever, direct or circumstantial, that she

suffered any discrimination whatsoever because of her being a Jordanian national.  To the

contrary, I find that the defendant treated her with consummate fairness and honesty.

III.     <u>Plaintiff's Breach of Contract Claim</u>

    In an earlier opinion in this case, the Court noted that plaintiff's breach of contract claim

could, under Virginia law, either sound in tort or in contract. <u>Ghawanmeh</u>, 672 F. Supp. 2d at 17.

On the one hand, the Court noted that, if the ISA argued that plaintiff was an at-will employee

and could be fired with or without cause, plaintiff could then argue that her firing violated public

policy because it was done in retaliation for her having pursued her rights under either the

FMLA or Title VII. <u>Id.</u>  Alternatively, the Court noted that if the ISA argued that plaintiff's

_____

motivated by a retaliatory intent.

contract was for a specific term, plaintiff could argue that the ISA breached the contract's implied covenant of good faith and fair dealing. Id.

The ISA's primary argument is that plaintiff was an at-will employee and therefore could be fired without cause. [#63] at 60.  The language of plaintiff's employment contract supports this conclusion.  Plaintiff's contract with the ISA for the period from 9/1/2008 to 8/31/2009 provided that the "ISA retains the right to terminate the service of any Employee without cause"[21] and that the "ISA may, upon providing thirty (30) calendar days written notice, terminate service of Employee other than for cause and will pay Employee any additional compensation due . . ." JEX 14 at 1.  Therefore, even though the ISA's Administrative Decision No. 5, the document which terminated plaintiff's employment, cited the recommendations of the Director of the Girls' Section, the Head of the Primary School at the Boys' Section, and the Head of the ASL Department, those references need not have been included in the document since the ISA was, by contract, within its rights to fire plaintiff without cause.

The next issue is whether plaintiff proved that, even though she was an at-will employee, her firing violated public policy.  That theory presupposes, however, that there has been a violation of plaintiff's rights.  See Lockhart v. Commonwealth Educ. Sys. Corp., 439 S.E.2d 328, 332 (1994) ("We have held that this exception to the employment-at-will doctrine is applicable, among other instances, when an employee is terminated from employment '*because* of discrimination based upon gender or race.'") (emphasis added) (internal quotation omitted).  In this case, as explained above, plaintiff failed to prove any of her claims.  Thus, the ISA

---

[21] Plaintiff's contract also specifically provides that she could be fired with cause and defines what constitutes cause. JEX 14 at 1.

36

neither breached its contract with plaintiff nor violated public policy prohibiting racial discrimination, when it fired her in January of 2009.

IV.     Plaintiff's Slander Claim

As noted previously in this case, under Virigina law, the law governing not only plaintiff's contract claims but also her tort claims, there are three elements to a slander or defamation claim: "'(1) publication about the plaintiff, (2) an actionable statement, and (3) the requisite intent.'" Ghawanmeh, 672 F. Supp. 2d at 20 (internal citation omitted).  This Court further noted that in order "[t]o be actionable, the statement must be both false and defamatory . . . [although] defamatory statements which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of such an office or employment, thereby damaging such person in his or her profession or trade, are considered actionable per se." Id. at 20 (internal quotation omitted).

The slander count in plaintiff's first amended complaint was dismissed because she failed to identify with precision the allegedly defamatory words. Ghawanmeh, 672 F. Supp. 2d at 20. In plaintiff's second amended complaint, the only actionable defamatory words plaintiff points to are comments allegedly made by Dr. Sakaji at a November 2008 meeting.[22]  According to plaintiff, he stated, in front of other schoolteachers and ISA staff members that plaintiff was "not a good teacher," and that she "did not like teaching." [#20-2] ¶ 75; 5/23/11 Tr. at 239-40.  At trial, plaintiff testified that these statements were made in front of Ms. Assaadi, the Girls' School

---

[22] Mysteriously, and despite my ruling that only the statement by Dr. Sakaji was actionable in this case, plaintiff in her proposed findings of fact purports to point to other statements never set out in the Second Amended Complaint, even though I limited her claim to the statement of Dr. Sakaji.  Plaintiff cannot assert that other statements were slanderous and pages 17-20 of Plaintiff's Proposed Findings of Fact and Conclusions of Law [#64] are, hereby, stricken from the record.

Coordinator and plaintiff's supervisor, and Ms. Hussein, the Boys' School Coordinator, who was also on the management staff of the ISA. 5/23/11 Tr. at 239-40.

First, plaintiff testified that Ms. Assaadi and Ms. Hussein heard these statements but never called Ms. Hussein as a witness nor asked Ms. Assaadi whether she heard the statement. Thus, while the statements themselves are admissible because they are verbal acts and not admitted for the truth of their contents, the only statement supporting the assertion that Dr. Sakaji said what she claimed is hearsay–her recounting what someone else told her which is unquestionably being offered for the truth of its contents.  Thus, there is nothing but hearsay supporting her claim.

Second, plaintiff proffered no proof whatsoever that these statements were repeated at any other time, whether within the ISA or outside of it. 5/23/11 Tr. at 241.  Thus, she never proved publication which, under Virginia law, requires that she show that the defamatory statement was uttered or repeated so that it was heard by persons who were not part of the same organization. Wines v. Fuller, 45 Va. Cir. 299, at *2 (Va Cir. Ct. 1998) (citing Chalkey v. Atl. Coastline Ry., 143 S.E. 631, 640 (Va. 1928)).  Nor did she provide any evidence that the statement in fact caused her damage, such as preventing her from finding a new job.  Indeed, she testified that she has not looked for a job since being fired. 5/23/11 Tr. at 242.  I am therefore compelled to find that she produced no evidence whatsoever that the statements caused her any damage.

Finally, although statements that impute to a person unfitness to perform his or her job are generally held to be *per se* actionable, statements of opinion are not. Chaves v. Johnson, 335 S.E.2d 97, 101 (Va. 1985).  In other words, expressions of opinion that are "relative in nature and depend largely upon the speaker's viewpoint" are not *per se* actionable. John C. Holland

Enters., Inc. v. Hadfield, No. CL07-CIV-457, 2007 WL 5969401, at *2 (Va. Cir. Ct. Nov. 29, 2007) (internal quotations omitted).  In this case, the alleged statements were made by Dr. Sakaji, who at the time was Head of the ASL Department and therefore responsible for overseeing plaintiff's ASL class in the Boys' School.  I conclude that the comments that were made to Ms. Assaadi and Ms. Hussein, both of whom had a professional interest in plaintiff's performance, were an expression of opinion and not slander.

## CONCLUSION

In accordance with the above <u>Findings of Fact and Conclusions of Law</u>, I find for the defendant on all counts.  The Clerk will enter judgment for the defendant.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE